IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| BRADLEY A. McKEOWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:18-cv-00306 |
| | ) | |
| KHALIL RAHIM, *et al.*, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Bradley McKeown, as administrator and personal representative of the estate of

Katherine McKeown, filed this action against defendants Khalil Rahim, Troy Livingston, V.

Jones Trucking, LLC (VJT), and James Hardie Building Products, Inc. (Hardie), seeking

damages for a vehicle collision in which a tractor-trailer driven by Rahim and owned by

Livingston struck the McKeowns' vehicle, killing Bradley's wife Katherine McKeown.  VJT and

Hardie each filed motions to dismiss McKeown's second amended complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6).  After the court held a hearing on defendants' motions,

McKeown filed a motion to file a third amended complaint.[1]  For the reasons that follow, the

court will grant in part and deny in part McKeown's motion to file a third amended complaint

and grant in part and deny in part defendants' motions to dismiss.

---

[1] McKeown actually filed two motions.  He filed his first motion to amend on January 4, 2020, (Dkt. No. 62) but filed a notice of withdrawal of that motion on January 10, 2020 (Dkt. No. 63).  He then filed a subsequent motion to amend his complaint, which is now before the court.  (Dkt. No. 64.)  Neither party requested a hearing on McKeown's motion for leave to file a third amended complaint, and the court finds that no hearing on the motion is necessary because the parties adequately present their arguments in the materials before the court.

# I. BACKGROUND

In August 2017, Bradley and Katherine McKeown were traveling on I-81 in Virginia when a tractor-trailer driven by Rahim and owned by Livingston rear ended their vehicle. The collision caused the McKeown's vehicle to spin sideways and crash into another vehicle. Katherine McKeown died at the scene of the accident. (Second Am. Compl. ¶¶ 1, 2, 30–35, Dkt. No. 33.)

McKeown alleges that Rahim acted negligently by failing to maintain control of his tractor-trailer, driving too fast, and otherwise operating his vehicle in an unsafe manner. According to McKeown, 60% of the tractor-trailer's brakes and six of ten brake chambers on the truck and trailer were not in working order, which contributed to the crash. (*Id.* ¶¶ 36–40.)

McKeown further alleges that VJT—a trucking company engaged in freight shipping and hauling—allowed Rahim and Livingston to transport loads under its USDOT number and federal operating authority, which were listed on the side of the truck at the time of the accident. (*Id.* ¶¶ 10, 16, 27.) On the date of the crash, Rahim was transporting a load under VJT's operating authority for Hardie, an entity engaged in manufacturing, distributing, and selling building products. (*Id.* ¶¶ 16, 24.) Accordingly, McKeown alleges that Rahim was acting within the scope of his employment with Livingston, VJT, and Hardie. (*Id.* ¶ 19.)

Based on the above, McKeown asserts the following claims: direct negligence against Rahim, Livingston, and VJT (Count One); vicarious liability against Hardie as Rahim's statutory employer under the Federal Motor Carrier Safety Regulations (FMCSRs) (Count Two); vicarious liability against Livingston and VJT (Count Three); negligent entrustment against Livingston and VJT (Count Four); negligent undertaking and assumption of duty against Hardie (Count Five); negligent hiring of an independent contractor against Hardie (Count Six); negligence and

negligence per se against VJT for aiding and abetting violations of the FMCSRs (Count Seven); and negligence per se against all defendants (Count Eight).

## II. DISCUSSION

### A. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, *i.e.*, the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwanted inferences, unreasonable conclusions, or arguments,'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

### B. VJT's Motion to Dismiss

McKeown's second amended complaint includes claims against VJT for negligence, vicarious liability, negligent entrustment, negligence and negligence per se for aiding and abetting violations of the FMCSRs, and negligence per se. The basis of these claims appears to

be the fact that VJT allowed Rahim to operate the tractor-trailer at issue using VJT's operating authority. (*See* Second Am. Compl. ¶ 50 ("[VJT] was directly negligent in causing McKeown's injuries and death by allowing Rahim and Livingston to procure and transport loads under [VJT's] name, USDOT number, and federal operating authority in violation of the [FMCSRs].").) VJT requests the court dismiss each of McKeown's claims against it.

### 1. Negligence

To establish a claim of negligence, McKeown must allege the elements of duty, breach, injury, and cause. *Bartlett v. Roberts Recapping, Inc.*, 153 S.E.2d 193, 196 (Va. 1967). VJT argues that McKeown has not alleged and cannot allege that VJT owed McKeown a duty. Even if VJT owed McKeown a duty, VJT contends that McKeown has failed to allege that its actions were the proximate cause of the accident and any injuries.

Because "[t]he 'finding of a legal duty' is a 'prerequisite to a finding of negligence,'" there can be no cause of action for negligence without such a duty. *Quisenberry v. Huntington Ingalls, Inc.*, 818 S.E.2d 805, 809 (Va. 2018) (quoting *Jeld-Wen, Inc. v. Gamble*, 501 S.E.2d 393, 397 (1998)). Although not expressly alleged in his second amended complaint, McKeown asserts that VJT owed a general duty of reasonable care under Virginia's common law. *See id.* ("General negligence principles require a person to exercise due care to avoid injuring others." (quoting *RGR, LLC v. Settle*, 764 S.E.2d 8, 16 (Va. 2014))). Because part of VJT's business involved sharing its operating authority so that Livingston and Rahim could engage in interstate transportation, McKeown asserts that it was foreseeable that VJT's failure to exercise care in choosing to share its authority with Rahim and Livingston could place other drivers in jeopardy.

McKeown is correct that the Supreme Court of Virginia has recently reaffirmed a broader general duty to others in *RGR* and *Quisenberry*. *See* Friend, 1 Personal Injury Law in Virginia

§ 2.1 (2019).  As the court recently stated, the "'broad common law maxim' sic utere tuo ut alienum non laedas requires that 'one must so use his own rights as not to infringe upon the rights of another.'" *RGR*, 764 S.E.2d at 16 (quoting *Cline v. Dunlora S.*, 726 S.E.2d 14, 17 (2012)).  "This duty is not abstract: a specific course of conduct gives rise to a specific duty extending to specific persons." *Quisenberry*, 818 S.E.2d at 810.  Accordingly, the general duty is owed "to those within reach of a defendant's conduct." *Id.* (quoting *RGR*, 764 S.E.2d at 17).

Even given this broader general duty, however, McKeown has failed to allege how it applies to VJT's sharing of operating authority.  McKeown's theory appears to be that VJT allowed Livingston and Rahim to use its operating authority to transport loads and, in doing so, acted negligently.  He essentially alleges that VJT had a duty not to share its operating authority, but he has failed to identify any Virginia authority recognizing such a duty.  Likewise, he has not identified how sharing operating authority, without more, "create[s] a recognizable risk of harm" to others, such that the general duty recognized in Virginia would apply here. *Quisenberry*, 818 S.E.2d at 811 (quoting *RGR*, 764 S.E.2d at 19).[2]  The court will therefore dismiss McKeown's negligence claim against VJT.[3]

---

[2] To the extent McKeown alleges that VJT had a duty not to share its operating authority "with an *incompetent* driver with a *poorly-maintained* truck," he asserts duties relevant to his claims of negligent entrustment and vicarious liability.  (Mem. in Opp. 8, Dkt. No. 51 (emphasis added).)  Those claims will be addressed in detail below.

[3] McKeown's proposed third amended complaint does not cure the deficiencies in Count One.  Although he expressly alleges that "V. Jones had a common-law duty not to do any act that a person of ordinary prudence could reasonably apprehend, as a natural and probable consequence thereof, would subject another person to an unreasonable risk of physical harm," he still has not identified how allowing Livingston and Rahim to use the operating authority, without more, created an unreasonable risk of harm to others.  Accordingly, the court will deny as futile McKeown's motion for leave to file an amended complaint with respect to McKeown's claims of negligence against VJT.

Because McKeown has not sufficiently alleged that VJT owed McKeown a duty, the court need not consider whether VJT's actions were the proximate cause of the alleged injuries.[4]

**2. Negligence Per Se**

VJT argues that McKeown's claim of negligence per se suffers the same deficiencies as his negligence claim in Count One. In Virginia,

> [a] party relying on negligence per se does not need to establish common law negligence provided the proponent of the doctrine produces evidence supporting a determination that the opposing party violated a statute enacted for public safety, that the proponent belongs to the class of persons for whose benefit the statute was enacted and the harm suffered was the type against which the statute was designed to protect, and that the statutory violation was a proximate cause of the injury.

*Schlimmer v. Poverty Hunt Club*, 597 S.E.2d 43, 46 (Va. 2004).

McKeown alleges that VJT was negligent per se by violating § 396.3 of the FMCSRs. As relevant here, that regulation states: "Every motor carrier . . . must systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles and intermodal equipment subject to its control." 49 C.F.R. § 396.3(a). It then specifies that "[p]arts and accessories shall be in safe and proper operating condition at all times," including any "parts and accessories which may affect safety of operation." *Id.*

The court believes this is the type of regulation that may form the basis of a negligence per se claim in Virginia. A requirement that motor carriers keep their vehicles in safe working order, specifically emphasizing the maintenance of parts that affect the safety of operation, suggests that this regulation was intended to protect members of the driving public, including the

---

[4] Nonetheless, the court questions whether sharing operating authority alone could have caused the accident in question. For example, in *Lester v. SMC Transport, LLC*, No. 7:15CV00665, 2016 WL 4595696, at *7 (W.D. Va. Sept. 2, 2016), the court dismissed a negligence claim where the plaintiff pleaded that the defendant was negligent because it allowed a tractor-trailer to enter interstate travel without insurance in violation of the FMCSRs. The court reasoned that the plaintiff did not identify "any authority suggesting that lack of insurance . . . could produce an event causing serious bodily injury." *Id.* Similarly in this case McKeown has not provided any authority suggesting that sharing operating authority, while perhaps in violation of the FMCSRs, could result in serious bodily injury.

McKeowns, from unsafe commercial vehicles like Livingston's. At this stage, McKeown has plausibly alleged that VJT, as a motor carrier, failed "to properly inspect, repair, and maintain the brakes on the tractor-trailer," (Second Am. Compl. ¶ 110) and that the brakes being "out of adjustment, out of service, and not in working order," was a factor in the collision (*Id.* ¶ 40).[5] Thus, the court will deny VJT's motion as to McKeown's negligence per se claim.[6]

### 3. Aiding and Abetting Violations of the FMSCRs

In Count Seven, McKeown asserts claims for negligence or negligence per se against VJT for aiding and abetting violations of the FMCSRs. He states that VJT had a "duty to comply with the requirements of the [FMCSRs], including § 390.13," which prohibits aiding or abetting violations of the FMCSRs. (*Id.* ¶ 101.) But, "the violation of a statute does not, by that very fact alone, constitute actionable negligence or make the guilty party negligent *per se*." *Williamson v. Old Brogue, Inc.*, 350 S.E.2d 621, 624 (Va. 1986). Moreover, not all statutes or regulations that have the effect of protecting the public are public safety measures that, when violated, may provide a basis for negligence per se.

For example, in *Williamson v. Old Brogue, Inc.*, the Supreme Court of Virginia held that a provision of the Virginia Code "directed to promotion of sobriety and public morality" was not enacted for public safety. 350 S.E.2d at 625. Even though the statute was "enacted pursuant to the police power of the State, 'in the interest of the safety, health, and well-being of the local communities' . . . [t]he danger confronted by the enactment was the unrestrained sale of intoxicants with the resulting threat to public sensibilities." *Id.* The court held that it was merely

---

[5] It is unclear at this stage whether VJT had "control" over Livingston or Rahim and, by extension, the tractor trailer at issue. However, VJT has not raised this issue with regard to § 396.3 in its motion to dismiss, and the parties did not address it in their arguments to the court. Thus, the court will not address it at this time.

[6] There is little difference between McKeown's second amended complaint and his proposed third amended complaint with respect to this claim. The court will therefore grant McKeown's motion to amend as to his negligence per se claim.

a licensing statute that could not provide the basis of liability for negligence per se. *Id.* ("While improved public safety and prevention of personal injury were incidental benefits flowing from the Act, public sobriety and individual moderation were its plain goals."); *see also Conway v. Lone Star Transp., LLC*, No. 19-CV-0658-CVE-FHM, 2020 WL 609750, at *4 (N.D. Okla. Feb. 7, 2020) ("[C]ertain aspects of the FMCSR are not aimed at protecting the driving public, and courts have considered on a case-by-case basis whether the specific regulation can support a negligence *per se* claim.").

The court cannot say that § 390.13, which addresses only aiding and abetting violations of the FMCSRs, was enacted for public safety. Although some of the FMCSRs undoubtedly seek to protect the public, this specific regulation is intended only to promote compliance with the regulatory scheme.[7] Accordingly, the court will dismiss this count of McKeown's second amended complaint.

### 4. Vicarious Liability[8]

McKeown next asserts that VJT was a "statutory employer" of Livingston and Rahim pursuant to the FMCSRs. Courts have addressed at least two different theories of statutory employment: one based on the definitions of "employee" and "employer" set forth in § 390.5 of the FMCSRs, *see, e.g.*, *Beavers v. Victorian*, 38 F. Supp. 3d 1260, 1269–71 (W.D. Okla. 2014), and one based on the so-called "responsibility and control" regulations of §§ 376.11 and 376.12 *see, e.g.*, *White v. Date Trucking, LLC*, No. ELH 17-1177, 2018 WL 2462921 (D. Md. June 1,

---

[7] Accordingly, any amendment to McKeown's complaint as to this count would be futile. The court will therefore deny as futile McKeown's motion for leave to amend with respect to his claim that VJT aided and abetted violations of the FMCSRs.

[8] In his second amended complaint, McKeown asserted two theories of vicarious liability—the statutory-employer theory discussed herein and a state-law claim based on the doctrine of respondeat superior. In his proposed third amended complaint, McKeown has removed his state-law claim. (*See* Reply in Supp. of Mot. 2, Dkt. No. 66 ("As VJT observes in its Brief in Opposition, the latest proposed Third Amended Complaint removes Plaintiff's claim that VJT was Defendant Khalil Rahim's common-law employer . . . .").) Accordingly, the court will deem this claim withdrawn and need not address it here.

2018). McKeown appears to rely primarily on the latter approach, but the court will nonetheless address both theories below.

To the extent McKeown argues that § 390.5 of the FMCSRs creates an employment relationship, the court disagrees. Section 390.5 defines "employee" and "employer" as follows:

> Employee means any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term *includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle)* . . . .

> Employer means any person engaged in a business affecting interstate commerce who *owns or leases a commercial motor vehicle in connection with that business, or assigns employees to operate it* . . . .

49 C.F.R. § 390.05 (emphasis added).

In *White v. Date Trucking*, the District of Maryland granted a motion to establish an employee relationship pursuant to the FMCSRs' definitions of employee and employer. 2018 WL 2462921, at *6. However, the court relied on *Beavers* to note that its decision to grant the motion was "a hollow victory. This is because Grantland's employee status under the FMCSR has no bearing on whether Date Trucking is vicariously liable for Grantland's alleged negligence." *Id.* The court reasoned that although there was an employment relationship as defined by the regulations, those definitions did not supplant the common-law employment relationship required to establish vicarious liability under state tort law. This court agrees that Virginia's common law, and not the definitions of § 390.5, control the court's vicarious-liability analysis.

But McKeown primarily argues that the principle of statutory employment under the FMCSRs came about based on the responsibility and control regulations. A provision of those

9

regulations requires motor carriers using equipment they do not own to enter written leases of the equipment granting them "exclusive possession, control, and use of the equipment for the duration of the lease."[9]  49 C.F.R. §§ 376.11, 376.12(c).  Those regulations further require that any lease shall "provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease."  *Id.* § 376.12(c).  Under McKeown's reading of the regulations, a motor carrier that uses only leased trucks and hires only independent contractors as drivers should still be liable for the actions of those independent contractors based on the statutory-employer relationship, even where they may have avoided liability under common-law principles of vicarious liability.

McKeown suggests that the responsibility and control regulations effectively preempt common law and created an irrebuttable presumption of agency.  He is correct that several courts prior to 1992 accepted and applied this theory.  For example, in *Ryder Truck Rental Co., Inc v. UTF Carriers, Inc.*, 719 F. Supp. 455 (W.D. Va. 1989), this court noted that "[i]n 1956, Congress amended the Interstate Common Carrier Act to require motor carriers to be fully responsible for the operation of vehicles certified to them in order to protect the public from certain abusive conduct which had resulted from the trucking industry's frequent use of leased or borrowed vehicles."  *Id.* at 457.  The Fourth Circuit also commented that "[t]he statute and regulatory pattern clearly eliminates the independent contractor concept from such lease arrangements and casts upon [the lessee-carrier] full responsibility for the negligence of [the lessor-contractor] as driver of the leased equipment."  *Proctor v. Colonial Refrigerated Transp.,*

---

[9] A "lease," as defined in 49 C.F.R. § 376.2, includes a "contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period . . . in exchange for compensation."  McKeown's second amended complaint is likely deficient in identifying a "lease" governing VJT's relationship to Livingston and Rahim.  He alleges only that VJT shared its operating authority with Rahim and Livingston.  (Second Am. Compl. ¶¶ 27, 50, 59.)  However, McKeown's proposed third amended complaint expressly alleges the existence of a "lease or arrangement" and payments from VJT to Livingston, from which a reasonable person may infer that Livingston granted the use of his truck to VJT in exchange for compensation.  (Dkt. No. 64-2, ¶¶ 80–88.)

*Inc.*, 494 F.2d 89, 92 (4th Cir. 1974). Thus, for a while, courts applied these regulations as though they created strict liability for lessees.

When those regulations were amended in 1992, however, courts split on whether the FMCSRs still preempted state tort law. Even the ICC indicated that the original intent of the regulations was not to preempt state law:

> While most courts have correctly interpreted the appropriate scope of the control regulation and have held that the type of control required by the regulation does not affect "employment" status, it has been shown here that some courts and State workers' compensation and employment agencies have relied on our current control regulation and have held the language to be prima facie evidence of an employer-employee relationship. These State agencies often find that the current regulation evidences the type of control that is indicative of an employer-employee relationship.

> We conclude that adopting the proposed amendment will reinforce our view of the neutral effect of the control regulation and place our stated view squarely before any court or agency asked to interpret the regulation's impact. The proposed amendment should eliminate the need for such tribunals to undertake any lengthy legal analysis of the control regulation and lessen the likelihood that they will reach the wrong conclusions. By presenting a clear statement of the neutrality of the regulation, we hope to bring a halt to erroneous assertions about the effect and intent of the control regulation, saving both the factfinders and the carriers time and expense.

*Petition to Amend Lease & Interchange of Vehicle Regulations*, 8 I.C.C.2d 669, 671 (1992). The amended regulation reflected these changes by stating:

> Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14202 and attendant administrative requirements.

49 C.F.R. § 376.12(c)(4).

Since the 1992 amendment, courts have taken three different approaches to the statutory-employment analysis:

> A small number of courts to have come in contact with these regulations cling to the pre-1992 interpretation of the control regulation. A second group has emerged that holds that Subsection (c)(4) requires that courts interpret the control regulation to have no bearing on the classification of the relationship between carriers and owner-operators. Finally, a third group of courts believe the control regulation and Subsection (c)(4) create a rebuttable presumption of employment that can be rebutted by resort to state common law principles.

*Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 878 (S.D.W. Va. 2017) (citations omitted). McKeown has cited to a number of pre-1992 cases from the Fourth Circuit and courts within the Fourth Circuit, *see, e.g.*, *Proctor v. Colonial Refrigerated Transp., Inc.*, 494 F.2d 89 (4th Cir. 1974); *Ryder Truck Rental Co., Inc. v. UTF Carriers, Inc.*, 719 F. Supp. 455 (W.D. Va. 1989), and several post-1992 out-of-circuit cases that appear to have continued the pre-amendment approach to liability, *see, e.g.*, *Puga v. About Tyme Transp., Inc.*, 227 F. Supp. 3d 760 (S.D. Tex. 2017). However, after 1992, courts within the Fourth Circuit have largely disagreed with the pre-1992 approach and placed emphasis on the amended language of § 376.12(c)(4).

For example, in *Lester v. SMC Transport, LLC*, the court rejected the plaintiff's theory that the regulations "cast upon motor carriers full responsibility for the negligence of drivers." *Lester v. SMC Transport, LLC*, No. 7:15CV00665, 2016 WL 4595696, at *3 (W.D. Va. Sept. 2, 2016) (quoting *Phillips v. Dallas Carrier Corp.*, 766 F. Supp. 416, 418–19 (M.D.N.C. 1991)). It recited § 376.12(c)(4) before stating that "[e]ven before the amendments, the ICC had stated that it 'did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise

exist.'" *Id.* (quoting *Lease & Interchange of Vehicles (Identification Devices)*, 3 I.C.C.2d 92, 93 (1986)).

Similarly, in *Penn v. Virginia International Terminals, Inc.*, 819 F. Supp. 514 (E.D. Va. 1993), the court rejected pre-amendment case law, stating that those cases

> are based upon an interpretation of the ICC regulations that were unintended by the ICC. Those cases find that an employer-employee relationship between lessee-lessor is mandated by the provision of 49 C.F.R. § 1057.12(c)(1) [the predecessor to § 376.12], which places exclusive possession, control, use and operation of the leased equipment under the lessor. This court believes that is a misinterpretation of the regulation, especially with the hindsight provided by the 1992 amendment . . . .

*Id.* at 523. The court then continued to evaluate whether the relationship at issue was an employee-employer relationship under Virginia common law. *Penn* involved a worker's compensation issue, but its reasoning is helpful here.

Based on existing case law in Virginia, there is at least a consensus that Virginia would not recognize the irrebuttable presumption of employment applied before the 1992 amendment. However, neither *Penn* nor *Lester* discuss whether the responsibility and control regulations should result in a rebuttable presumption of employment or whether the plain language of § 376.12(c)(4) mandates that courts rely only on state-law principles.

In *Edwards v. McElliotts Trucking*, the Southern District of West Virginia applied a rebuttable presumption of employment. 268 F. Supp. 3d at 878. It reasoned that acknowledging a rebuttable presumption would "avoid[] the fundamental problem with each of the other two interpretations—disregard of either Subsection (c)(1) or (c)(4)." *Edwards*, 268 F. Supp. 3d at 879. It stated that an irrebuttable presumption ignores subsection (c)(4), while resort to common law effectively "wish[es] away Subsection (c)(1)." *Id.* ("[N]either Congress nor the ICC

intended for the control regulation to be reduced to a *pro forma* clause in a lease with no application other than a mechanical repetition of the regulation in leasing contracts.").

This court agrees with *Edwards* that "[c]ourts that have continued to hold that the control regulation creates an irrebuttable employment relationship read Subsection (c)(4) out of the ICC regulations and ignore the ICC's plainly stated intent in its guidance documents." *Id.* But it disagrees with the *Edwards* court's conclusion that the regulations create a rebuttable presumption of agency.

The reasoning employed in *White* with regard to statutory employment under § 390.5 is helpful here. In *White*, the court observed that no provision of the FMCSRs suggests that the regulations are intended to preempt state common law with regard to vicarious liability. In fact, the ICC expressly stated that it did not intend § 376.12 to have such an effect. 2018 WL 2462921, at *4. Additionally, the FMCSRs create an enforcement mechanism for the Federal Motor Carrier Safety Administration (FMCSA) apart from state law. *See* 49 C.F.R. § 390.37 ("Any person who violates the rules set forth in this subchapter . . . may be subject to civil or criminal penalties."); *see also White*, 2018 WL 2462921, at *5. Thus, subsection (c)(1) shifts the burden of complying with the FMCSRs, and any resulting civil or criminal liability under § 390.37, to the lessee. Relying on common-law to determine tort liability therefore does not eliminate the effect of that provision.[10]

---

[10] McKeown also argues that guidance appearing on the FMCSA's website supports the theory of statutory employment. The guidance states as follows:

> Question 17: May a motor carrier . . . transfer the responsibility *for compliance with the FMCSRs* to the owner-operators?
> Guidance: No. The term "employee," as defined in § 390.5, specifically includes an independent contractor employed by a motor carrier. . . . The motor carrier is, therefore, responsible for compliance with the FMCSRs by its driver employees, including those who are owner-operators.

*Section § 390.5: Definitions*, Part 390, https://www.fmcsa.dot.gov/regulations/title49/section/390.5. But this guidance, like the regulations themselves, says nothing about vicarious liability for state tort-law claims. It states

This court agrees with the federal courts in Virginia that have already addressed this issue and therefore finds that § 376.12 is not intended to "supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where non would otherwise exist." *Lester*, 2016 WL 4595696, at *3. To hold otherwise would be "a misinterpretation of the regulation, especially with the hindsight provided by the 1992 amendment." *Penn*, 819 F. Supp. at 523; *see also Jett v. Van Eerden Trucking Co., Inc.*, No. CIV-10-1073-HE, 2012 WL 37504, at *4 (W.D. Okla. Jan. 9, 2012) ("[T]he ICC clarified that the control regulations were not intended to create a federal theory of liability supplanting otherwise applicable state law concepts of agency, independent contractor, and the like. There is no apparent basis for ignoring, or reaching a conclusion different from, the agency's statement and clarification."). If McKeown wants to hold VJT vicariously liable for Livingston's or Rahim's actions, he must rely on state-law principles.[11]

Accordingly, the court will grant VJT's motion to dismiss McKeown's statutory-employment claim and will deny as futile McKeown's motion for leave to amend as to this claim.

### 5. Negligent Entrustment

To state a claim for negligent entrustment of property,[12] a plaintiff must allege that "the owner knew, or had reasonable cause to know, that he was entrusting his [property] to an unfit

---

[11] To be clear, if a motor carrier agrees to assume control of a leased vehicle, such an agreement may very well be evidence of the "control" required by Virginia's *respondeat superior* analysis. *See Lester*, 2016 WL 4595696, at *4 (setting forth the elements of a vicarious liability claim under the doctrine of respondeat superior). However, sharing or entering an unwritten agreement to share or lend equipment or operating authority does not, in itself, indicate any level of control over the actions of an independent contractor.

[12] The parties argue at length about whether VJT entrusted physical property or an activity to Livingston and Rahim. Specifically, McKeown asserts that § 308 of the *Restatement (Second) of Torts* recognizes liability for

only that a motor carrier may not avoid the responsibility of *complying with the FMCSRs*, which the FMCSA has the power to enforce.

[user] likely to cause injury to others." *Denby v. Davis*, 188 S.E.2d 226, 229 (Va. 1972).

Typically, the Supreme Court of Virginia allows negligent entrustment claims "only where the

owner had notice of some physical or mental defect" of the entrustee. *Lester*, 2016 WL

4595696, at *5; *Darnell v. Lloyd*, No. 4:14cv94, 2016 WL 1464564, at *3 (E.D. Va. Apr. 13,

2016). "Furthermore, in order to impose liability upon the owner, the plaintiff must prove that

the negligent entrustment . . . was a proximate cause of the accident." *Turner v. Lotts*, 422

S.E.2d 765, 767 (Va. 1992). In this context, cause requires that the entrustee "was negligent as a

result of the unfitness." *Bastable v. Muslu*, No. CL08-1191, 78 Va. Cir. 401, 2009 WL 7339887,

at *2 (Va. Cir. July 8, 2009); *see also Hack v. Nester*, 404 S.E.2d 42, 43 (Va. 1990) ("[T]here

can be no recovery for negligent entrustment unless the reason for the entrustee's disqualification

from securing a license was a proximate cause of the collision."). Here McKeown argues that

VJT negligently entrusted its operating authority to Livingston and Rahim. Because McKeown

has failed to allege either that VJT had cause to know that Rahim and Livingston were unfit

users of the operating authority or that VJT's entrustment was the proximate cause of the

accident, McKeown has failed to state a claim for negligent entrustment.

In his second amended complaint, McKeown alleges that VJT "had a duty to exercise

reasonable care—including making sure there was insurance coverage for the driver and vehicle

and that Livingston and Rahim were competent, fit and operated safely—before allowing

Livingston or Rahim to use its USDOT number and federal operating authority." (Second Am.

Compl. ¶ 76.) He then summarily states that VJT "failed in the above-mentioned duties and

[was] therefore negligent," and that VJT's negligence "was a direct and proximate cause of the

---

entrusting an activity. *See Jones v. D'Souza*, No. 7:06CV00547, 2007 U.S. Dist. LEXIS 66993, at *16–20 (W.D. Va. Sept. 11, 2007). In so arguing, McKeown seeks to distinguish his case from those discussed herein and avoid the requirements of negligent entrustment as that doctrine applies to entrustment of vehicles or other property. But he has cited no authority that suggests the same principles do not apply in a case where an activity was negligently entrusted. Accordingly, the court will apply the same analysis as any case involving entrustment of a chattel.

Crash." (*Id.* ¶¶ 77–78.) Later in his complaint, under different claims, McKeown also alleges that "there were red flags" about Livingston and Rahim (*id.* ¶ 93), and that neither Livingston nor Rahim had their own operating authority or insurance (*id.* ¶ 100).

Even if VJT knew that Rahim and Livingston lacked insurance and operating authority, that is insufficient to hold VJT liable for negligent entrustment. For one, neither indicates that Rahim or Livingston suffered a "physical or mental defect" like vision problems, *Denby*, 188 S.E.2d 226, or a reputation for drinking, *Crowell v. Duncan*, 134 S.E. 576 (Va. 1926), which may render them unfit to operate a tractor-trailer. Nor has McKeown alleged that Rahim or Livingston at any point had operating authority or insurance that was later "restricted, suspended, or revoked." *Turner*, 422 S.E.2d at 767.

McKeown's allegations also do not permit the court to reach an inference that VJT's entrustment was the proximate cause of the accident. With regard to the lack of insurance, this court rejected a similar argument in *Lester*. 2016 WL 4595696, at *7 (finding that a lack of insurance could not have caused an accident); *see supra* n.4. The Supreme Court of Virginia has also found that the lack of a driver's license is insufficient to establish cause for a negligent entrustment claim. *Laughlin v. Rose*, 104 S.E.2d 782, 786–87 (Va. 1958) ("The lack of a driver's license did not proximately cause or contribute to the collision. Nor would it have been avoided had she had a license."); *see also Duncan v. Hixon*, 288 S.E.2d 494, 495 (Va. 1982) ("In a majority of accident cases, the violation of a licensing statute by a driver is not held relevant to the determination of fault."). Instead, Virginia allows the lack of a license to form the basis of a negligent entrustment claim only where the defect that prevented the entrustee from obtaining a license is the cause of the injury. *Hack*, 404 S.E.2d at 43. McKeown has not alleged why Rahim

17

and Livingston did not obtain operating authority or insurance.[13]  Rather, McKeown's allegations are conclusory or based on speculation.[14]  Although VJT may have known or should have known that Livingston and Rahim lacked operating authority and insurance, those deficiencies did not cause the accident at issue and cannot be the basis of McKeown's negligent entrustment claim.[15]

*　　*　　*

Based on the foregoing, the court will grant VJT's motion to dismiss as to McKeown's claims against VJT for negligence, vicarious liability as a statutory employer, negligent entrustment, and negligence or negligence per se by aiding and abetting violations of the FMCSRs.  McKeown adequately stated a claim against VJT for negligence per se.

## C. Hardie's Motion to Dismiss

### 1. Assumption of Duty

In the second amended complaint, McKeown alleges that Hardie "undertook and assumed the non-delegable duty to provide reasonably safe transport of this load and breached this duty."  (Second Am. Compl. ¶ 83.)  Hardie argues that McKeown has failed to allege

---

[13] In his proposed third amended complaint, McKeown adds that "Livingston and Rahim *could not get* federal operating authority."  (Dkt. No. 64-2, ¶ 102 (emphasis added).)  Again, however, lack of operating authority is insufficient without allegations regarding *why* the licensing authority found them unfit to obtain their own operating authority.  Because McKeown still has not alleged the reason Rahim or Livingston could not obtain operating authority, the court will deny as futile McKeown's motion for leave to amend as to his negligent entrustment claim against VJT.

[14] For example, at the hearing on VJT's motion, McKeown asserted that a lack of operating authority "might" indicate that Rahim and Livingston could no afford to obtain authority or insurance and therefore likely could not afford to meet safety requirements; or that one of them had a trucking company that had so many violations it was shut down.  But this is merely speculation.  McKeown has not alleged that similar issues prevented Rahim and Livingston from obtaining operating authority or insurance.

[15] McKeown argues that operating authority is much different than a driver's license and is more difficult to obtain.  However, he has cited no authority suggesting that the lack of operating authority, without more, can be the proximate cause of a traffic accident.  To the contrary, the court believes that the reasoning adopted by Virginia courts applies similarly to both a driver's license and operating authority.

sufficient facts to state a claim for breach of an assumed duty. The court agrees and will dismiss Count Five of McKeown's second amended complaint.

Virginia has adopted the common-law principle of assumption of duty through its application of §§ 323 and 324A of the Restatement on Torts. *See Burns v. Gagnon*, 727 S.E.2d 634, 643 (Va. 2012); *Kellermann v. McDonough*, 684 S.E.2d 786, 489 (Va. 2009). Pursuant to that principle, "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Kellermann*, 684 S.E.2d at 791. Specifically, McKeown appears to proceed under § 324A of the Restatement, which governs liability to third persons, *Burns*, 727 S.E.2d at 643–44, and provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

The threshold question is therefore whether Hardie ever undertook to assume a duty to provide safe transport of its load. The Supreme Court of Virginia has acknowledged that a tort duty may be either expressly or impliedly assumed.[16] *See Terry v. Irish Fleet, Inc.*, 818 S.E.2d

---

[16] Hardie relies on *A.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460 (Va. 2019), to argue that Virginia law requires an express assumption of duty. However, in *A.H. v. Church of God*, the court discussed the "rare circumstances" in which a defendant may be liable for assuming a duty to protect against criminal conduct. *Id.* at 468 ("[A]n action tantamount to an 'express communication' of a 'specifically described undertaking' is required to conclude that a defendant has assumed a legal duty to protect another from a *criminal* assault." (emphasis added)).

788, 793–94 (Va. 2018) (discussing cases in which the Supreme Court of Virginia has acknowledged that an assumed duty could be based on a motorist signaling or gesturing to another which could be interpreted as communicating that it was safe to proceed); *Kellerman*, 684 S.E.2d at 791–92 (finding that the defendant assumed a duty to provide service to the decedent by telling the decedent's parents, "don't worry, I promise we'll take good care of her"); *see also* Dan B. Dobbs et al., The Law of Torts § 412 (2d ed. 2019) (noting that liability to a third person may arise in the situation where a defendant "can be perceived as having undertaken actions that will provide safety for a different person").

Count Five of McKeown's complaint fails at this first step of the analysis. In his second amended complaint, McKeown makes conclusory statements that Hardie assumed a duty to transport the load safely. He also asserts that Hardie retained control over the load and that by listing itself as the carrier on the Bill of Lading for the load, Hardie held itself out to the public as the load's carrier and thereby assumed a duty. But other than McKeown's conclusory statements, there is no indication that Hardie, through the bill of lading or otherwise, ever assumed a duty to provide safe transport. There are no allegations that Hardie represented to VJT, Rahim, or Livingston either expressly or by beginning to act, that it would, for example, inspect the vehicle, load the truck, or take any other action in furtherance of safe travel.

Likewise, McKeown's proposed third amended complaint does not state a claim by adding the allegation that Hardie's rate confirmation sheet "stated that the driver must adhere to the James Hardie shipping department's safety policies and loading procedures." (Dkt. No. 64-2, ¶ 110.) Although this may support McKeown's claim for vicarious liability by indicating that Hardie exercised "control" over its codefendants, it is insufficient to state a claim for assumption

Moreover, in *Terry*, the court clearly stated that "a duty that does not otherwise exist may be *impliedly* assumed from the defendant's conduct." *Terry v. Irish Fleet, Inc.*, 818 S.E.2d 788, 793 (Va. 2018) (emphasis added).

of duty. *See Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998) (finding that the defendant requiring its independent contractors to create and comply with safety rules does not establish a reasonable inference that the defendant assumed a duty); *Musgrave v. Tenn. Valley Auth.*, 391 F. Supp. 1330, 1332 (N.D. Ala. 1975) (stating that a contract requiring a contractor's adherence with specific safety programs did "not indicate that the T.V.A. intended to render safety inspection services for the contractor nor to assume any duty to insure that the required safety procedures were followed").

Accordingly, the court finds that McKeown has failed to allege that Hardie assumed a duty to provide safe transport of its goods and will therefore dismiss Count Five of the second amended complaint. Furthermore, because McKeown's proposed third amended complaint also fails to state a claim for assumption of duty, the court finds that the proposed amendment would be futile and will deny McKeown's motion for leave to amend as to this count.

## 2. Negligent Hiring

Hardie next argues that McKeown has failed to state a claim for negligent hiring. "[N]egligent hiring 'is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others.'" *Interim Personnel of Central Va., Inc. v. Messer*, 559 S.E.2d 704, 707 (Va. 2002) (quoting *Se. Apartments Mgmt. v. Jackman*, 513 S.E.2d 395, 397 (Va. 1999)). "Liability for negligent hiring is based upon an employer's failure to exercise reasonable care in placing an individual with known propensities, or propensities that should have been discovered by reasonable investigation, in an employment position in which, due to the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to

others." *Id.* A claim for negligent hiring therefore requires "(1) physical harm to a third party, (2) caused by failure to exercise reasonable care to employ a competent and careful contractor, (3) to work which involves risk of physical harm unless it is skillfully and carefully done."[17] *Turner v. Syfan Logistics, Inc.*, No. 5:15cv81, 2016 WL 1559176, at *9 (W.D. Va. Apr. 18, 2011). But the exact injury need not be foreseeable so long as "an ordinary, prudent person ought, under the circumstances, to have foreseen that an injury might probably (not possibly) result from the negligent act." *Interim Personnel of Central Va.*, 559 S.E.2d at 708.

Hardie points out that McKeown's second amended complaint contains little to no facts indicating that Hardie should have known VJT, Livingston, or Rahim were incompetent. In fact, the second amended complaint merely alleges that Hardie failed to perform a sufficient investigation into its codefendants and that had Hardie conducted such an investigation, it would have discovered "red flags" about the "incompetent, unfit, and inexperienced brokers, contractors, or sub-haulers" and the tractor-trailer. (Second Am. Compl. ¶¶ 92–93.) At the hearing, McKeown further stated that the lack of operating authority and insurance further indicate that Hardie's codefendants failed to comply with the FMCSRs. But McKeown does not specify what "red flags" would have been found or how those "red flags" indicate either that VJT, Rahim, and Livingston were unfit or that the "red flags" were the proximate cause of the accident. As discussed above, the lack of operating authority or insurance alone do not mean that VJT, Rahim, and Livingston were not careful or competent contractors. *See, e.g.*, *Laughlin*, 104 S.E.2d at 786–87 ("[T]he failure of a competent driver to obtain a chauffeur's license 'could

---

[17] The parties do not dispute the first element. To the extent Hardie disputes that interstate trucking involves a risk of physical harm, the court has already addressed the inherent dangers in such work above. *See also Jones v. C.H. Robinson Worldwide, Inc.*, 558 F. Supp. 2d 630, 642 (W.D. Va. 2008) (stating in the context of a negligent hiring claim that "the operation of a tractor-trailer on a public highway involves just such a risk of physical harm").

not by any possibility have contributed proximately to the happening' of a collision in which he was involved." (quoting *S. Railway Co. v. Vaughan's Adm'r*, 88 S.E. 305, 308 (Va. 1916))).

By contrast, courts have allowed negligent hiring claims to survive when complaints allege facts about the employee or independent contractor that indicate they had a history of unsafe driving or safety violations. For example, in *Jones v. D'Souza*, the plaintiff alleged, among other things, that the independent contractor "had been assigned a conditional or unsatisfactory safety rating by the [FMCSA]." No. 7:06CV00547, 2007 U.S. Dist. LEXIS 66993, at *15 (W.D. Va. Sept. 11, 2007). Likewise, in *Turner*, the plaintiff pointed to data and rankings from the FMCSA's website indicating that the independent contractor had some of the worst ratings among drivers and received several violations. 2016 WL 1559176, at *10. In both cases, the plaintiffs relied on allegations that identified specific "red flags" about the hired parties other than or in addition to mere inexperience and conclusory statements.

Based on the dearth of specific allegations in McKeown's second amended complaint, the court finds that McKeown has failed to state a claim for negligent hiring.

However, in his proposed third amended complaint, McKeown adds allegations that VJT had a "history of safety violations" and that the FMCSA issued only conditional authority to transport loads—a fact that would plausibly prompt a reasonable person to investigate further. (Dkt. No. 64-2 ¶ 136.) *See also Jones*, 558 F. Supp. 2d at 643 ("A conditional rating indicates that the FMCSA considers that the carrier does not have adequate safety management controls in place."). Thus, it is plausible that a reasonable person in Hardie's position would have performed a more in-depth investigation, discovered the safety concerns surrounding VJT, and avoided the accident by refusing to hire VJT and, consequently, Rahim and Livingston.

Hardie has not opposed McKeown's motion for leave to amend, and, based on the foregoing, the court finds that McKeown's proposed third amended complaint is not futile with respect to his negligent hiring claim. Accordingly, the court will grant McKeown's motion for leave to amend as to this count.

## B. McKeown's Motion to File a Third Amended Complaint

"Under Federal Rule of Civil Procedure 15(a), leave to amend a pleading 'shall be freely given when justice so requires.'" *Edwards*, 178 F.3d at 242 (quoting Fed. R. Civ. P. 15(a)). In fact, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there as been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986). "[D]elay alone is not sufficient reason to deny leave to amend." *Id.*

McKeown proposes to amend his complaint both to bolster his existing claims with new allegations and to assert a new claim for vicarious liability. As to his proposed amendments to existing claims, VJT argues that McKeown's amendment is futile. An amendment may be futile when the "proposed amendments could not withstand a motion to dismiss." *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). As discussed throughout the court's analysis of the motions to dismiss, above, McKeown's new allegations lend support to several of McKeown's claims, but do not save others. Accordingly, the court will grant McKeown leave to amend with regard to his common law vicarious liability and negligence per se claims against VJT and his negligent hiring claim against Hardie. McKeown's motion will be denied as to the remainder of the claims he asserted in his second amended complaint.[18]

---

[18] To the extent that the allegations included under the dismissed claims are relevant to the surviving claims, McKeown may include those factual allegations; however, he may not reassert the dismissed claims based on the proposed amendments to the complaint.

As for McKeown's newly asserted claim against Livingston and VJT for vicarious liability on a joint venture theory, the court will grant the motion for leave to amend. In a successful joint venture claim, "[t]he negligence of one participant in a joint enterprise is imputed to all participants." *Alban Tractor Co. v. Sheffield*, 263 S.E.2d 67, 68 (Va. 1980). "To constitute a joint enterprise within the meaning of the law, the parties must have a community of interest in the object and purpose of the undertaking, and an equal right to direct and govern the movements and conduct of each other in respect thereto." *Id.* (quoting *Miller v. Query*, 110 S.E.2d 198, 201 (Va. 1959)).

VJT argues both that amendment to include this claim would be both futile and unduly prejudicial. Specifically, it asserts that amendment would be futile because it fails for the same reasons as McKeown's negligence claims above—the fact that VJT did not owe a duty to McKeown. But this argument ignores the purpose of the joint venture theory, which would allow McKeown to recover from VJT for *Livingston*'s negligence.[19] McKeown alleges that Livingston owned the tractor-trailer and failed to keep it maintained in proper order. As the owner, Livingston undoubtedly had a duty to ensure the tractor-trailer was well-maintained before entrusting it to others. *See Hack*, 404 S.E.2d at 44 ("An owner is negligent if he entrusts his vehicle to another person when the owner knows, or reasonably should know, that the vehicle's condition makes its normal operation unsafe."). Yet, Livingston "entrusted the tractor-trailer to Rahim, even though Livingston knew, or reasonably should have known, that the tractor-trailer's condition made its normal operation unsafe," (Dkt. No. 64-2, ¶ 45), and that failure to maintain the braking system caused the accident. If McKeown can prove these

_____

[19] VJT also casts doubt on whether there was an agreement such that McKeown can assert a joint venture claim. But McKeown has alleged payments between VJT and Livingston stemming from a shared undertaking. Although the court questions whether Livingston had any measure of control over VJT's actions based on McKeown's scant allegations, VJT has not raised that issue.

allegations and the existence of a joint venture between VJT and Livingston, VJT may be liable for Livingston's negligence even if it owed no duty itself.

The court also disagrees with VJT's argument that it is unduly prejudiced by the amendment. McKeown's joint venture claim largely incorporates the same issues as the rest of the litigation such that it will not result in a "more complicated and lengthy trial" and is not proposed so late that VJT would be required to undertake significant eleventh-hour discovery or preparation. *See Smith v. Angelone*, 111 F.3d 1126, 1134 (4th Cir. 1997) (noting that the timing of the proposed amendment is a significant factor) (quoting 4 Charles A. Wright et al., *Federal Practice and Procedure* § 1487, at 623–26 (2d ed. 1990)); *Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, No. 6:12-cv-00023, 2013 WL 782791, at *2 (W.D. Va. Mar. 1, 2013) ("A common example of a prejudicial amendment is one that raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant *and is offered shortly before or during trial*." (emphasis added)). Notably, the court has not entered a scheduling order or set a trial date in this case.

VJT's major concern appears to be that it has already deposed several parties and now will not have the opportunity to question them about McKeown's newest claim. Although the Federal Rules of Civil Procedure place limits on a party's ability to take depositions, there are also exceptions to those rules. *See* Fed. R. Civ. P. 30. If McKeown will not stipulate to allow VJT an opportunity to take subsequent depositions, VJT may request leave from the court.

### III. CONCLUSION

For the reasons set forth above, the court will grant in part and deny in part VJT's motion to dismiss, Hardie's motion to dismiss, and McKeown's motion for leave to file a third amended

complaint. A separate order will be entered.

Entered: March 16, 2020.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge